Nᴏᴛ Rᴇᴄᴏᴍᴍᴇɴᴅᴇᴅ ғᴏʀ Pᴜʙʟɪᴄᴀᴛɪᴏɴ ᴏʀ Cɪᴛᴀᴛɪᴏɴ

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 09-CV-074-KKC

JAMES H. LARSON                                                    PLAINTIFF

VS:                         **MEMORANDUM OPINION AND ORDER**

UNITED STATES OF AMERICA                                      DEFENDANT
and FMC-LEXINGTON UTILIZATION COMMITTEE

**** **** ****

This matter is before the Court on the parties' several pending Motions, including the Defendants' Motion to Dismiss or in the Alternative, Motion for Summary Judgment.  For the reasons set out below, the dispositive Motion will be granted and the Petition dismissed.

## BACKGROUND

James H. Larson was incarcerated in the Federal Medical Center, in Lexington, Kentucky ("FMC-Lexington"), on March 5, 2009, when he initiated the instant *pro se* civil rights action pursuant to 28 U.S.C. § 1331 and the doctrine announced in *Bivens v. Six Unknown Federal Narcotics Agents*, 430 U.S. 388 (1971).  With his release date only one month away, Plaintiff claimed that the Bureau of Prisons ("BOP") was refusing to timely correct a severe inguinal hernia, which the Court construed as an Eighth Amendment medical care claim; and was planning to release him with only $25.00, despite being authorized to give him a release gratuity of up to $500.00.

Plaintiff specifically alleged that he developed the hernia while incarcerated at a Kentucky

prison, in 2002, but he did not notice it until December of that year, when he entered the Federal Correctional Institution in Manchester, Kentucky.  Purportedly in the years since then, " a simple hernia has progressed to a huge opening that has allowed my intestine to slide into my scrotum, causing a huge ball about the size of a grapefruit to reside between my legs at all times."

According to Plaintiff, on October 30, 2008, he was transferred to his current location, the Federal Medical Center ("FMC")-Lexington, with the express purpose "to have [the] hernia repaired before being reparoled on April 7, 2009."  However, despite several recommendations for him to have a surgical repair, by both medical personnel within the institution and a contract surgeon from outside the prison, the institutional Utilization Review Committee ("URC") purportedly refused to authorize the expenditure.

With his reparole date quickly approaching and still no corrective surgery being planned, the Plaintiff filed his self-styled Complaint, and he attached documents showing that he had exhausted the issue of the repair through the BOP's administrative remedy program, Administrative Remedy No. 517609.  The Warden had responded that Plaintiff had "an uncomplicated inguinal hernia which has been present for at least five years . . . . [Surgical repair] is considered an elective procedure and as such will be scheduled only when the other higher priority obligations have been adequately addressed."

Upon appeal of that response, the BOP's Regional Director told Larson that a specialist had recently recommended a surgical repair.  "This procedure is currently scheduled and is pending.  Due to security requirements you will not be informed of the specific date of this procedure." Larson later went on to file an appeal to the BOP National Office, the final step in the administrative process, complaining therein that "with only twenty-one (21) days to go" until his release, he had not yet

2

received a BOP response – nor the promised surgery.

Further, Plaintiff pointed out the difficulties if the surgery were to be delayed until after his scheduled release to Dismas House, a Louisville, Kentucky, Community Corrections Center [recently renamed Residential Re-entry Centers, "RRC," an abbreviation which the Court will use hereafter]. If the surgery were delayed until then, Larson's opportunities to get a job, earn money, and otherwise fulfill his obligations at the RRC would be impaired. Worse, at an RRC, he must be responsible for his own medical costs, but he has no family or resources that will enable him to pay for the surgery.

Finally, Larson contended that the "release gratuity" which he was scheduled to receive is only $25.00, an insufficient sum to get clothes, activate his driver's license, and get re-started in the community. Exhibits show that in February of 2009, he started the administrative process, Administrative Remedy No. 527113, to obtain the maximum amount allowed, *i.e.*, $500.00. At the time of filing this action, an appeal was pending at the office of the BOP's Regional Director, the third step in the BOP's 4-tiered administrative remedy process.

Accordingly, with time running out, Larson asked that this Court order the BOP to arrange the surgery immediately; provide him with $500 on April 7, 2009; and award him $300,000.00 for his pain and suffering since his arrival at FMC-Lexington.

## RESPONSE TO COMPLAINT

The United States and the Lexington prison's Utilization Review Committee, by counsel, have responded with a Motion to Dismiss or in the alternative, Motion for Summary Judgment, motions which are supported by several declarations of BOP personnel and numerous exhibits.

These Defendants provide additional facts about the Plaintiff. While his underlying crime is not relevant to this screening, other facts are pertinent. For example, Plaintiff was out of custody,

3

on parole, from sometime in 2003 until October of 2008, when his parole was revoked and he was again placed into the custody of the BOP.  The Defendants stress that in that *5-year* period on parole, he did not seek medical care for the hernia, but in the *5+ months* that he was in BOP custody, from October 30, 2008, to April 7, 2009, he demanded that the BOP provide the hernia surgery *post haste*.  The Defendants set out a chronology of events evidencing the BOP's intent to schedule the desired surgery, but claim that they simply ran out of time to do so.

The Defendants also contradict several of the Plaintiff's initial factual allegations.  They first explain the BOP's medical care classification system.[1]  They then contend that Larson was healthy enough for the designation which he received upon his arrival at FMC-Lexington, *i.e.*, placement in the general inmate population "with a Care 2 medical designation."  They also insist that he was not moved to the FMC for the purpose of repairing his hernia.  To the contrary, "[i]nmates sent for specific medical treatment are usually designated as Care 3 inmates . . . and housed on a medical unit within the institution," neither of which occurred with the instant Plaintiff.

Additionally, according to these Defendants, the URC was not even involved in the medical issue herein.  In the declaration of Dr. Growse, the Clinical Director of the prison wrote, "The URC reviews cases which the Clinical Director requests them to do if there are questions about the

---

[1]  "There are four levels in the BOP's medical care level classification system," and the named Defendants described that system as follows:

> CARE level 1 inmates are generally healthy and may have some limited medical needs that can be easily managed.  CARE level 2 inmates are stable outpatient [sic] who require at least a quarterly clinician evaluation.  Their medical issues can be managed through routine and regularly scheduled evaluations by the appropriate clinicians.  CARE level 3 inmates are fragile outpatients who require frequent clinical contacts to prevent hospitalization.  These inmates may also require some assistance with activities of daily living.  CARE level 4 inmates require services only available in Medical Centers.  These inmates require enhanced medical care and supervision.

Record No. 21 at 2, fn. 2.

appropriateness of the request for surgery." Upon the examination of Larson, first by his primary care provider in November, and then by the Clinical Director himself, a surgical evaluation was immediately decided upon. By February 18, 2009, the Plaintiff had been evaluated by the consulting surgeon, but when all medical experts were in agreement in March, there was not enough time left for surgery and recuperation before his April 7, 2009, release to an RRC.

In all, the Defendants stress the fact that Plaintiff did not arrive at FMC-Lexington until October 30, 2008, and was gone less than six months later. The Defendants also note that Larson did not ask to retard his release on parole in order to have the surgery before release. Instead, on April 7, 2009, the BOP relinquished all custody of him to the United States Parole Commission, and as scheduled, Larson moved on to the RRC, Dismas House, in Louisville.

As to the relevant law, the Defendants' position is that Plaintiff's release gratuity claim should be dismissed for his failure to exhaust the BOP's administrative remedy system prior to filing this lawsuit; and his cruel and unusual punishment claim with regard to his hernia should be dismissed for his failure to state a cognizable federal claim against his named Defendants.

**Additional Responsive Pleadings**

Plaintiff has responded to the Defendants' dispositive Motion with a Response, a Motion to Add Exhibits, and a Motion for Discovery. [Record Nos, 23-24, 26]

Adding to his allegations, Larson states his belief that Dr. Growse, hospital staff on the URC, the warden and deputy warden "were made aware of Plaintiff's grievances and hernia." He rejects the contention that the URC was not involved in blocking or delaying his hernia surgery, based on his belief that *all* FMC surgeries must come through the URC. His position is that "Dr. Growse, and other members of the URC personally slow walked a needed repair to a serious hernia to comply

5

with the FMC's budget. Knowingly placing Plaintiff away from care out into the community."

Further, Larson informs the Court that after his release, he was rushed to the emergency room of the Louisville Medical Center for a blocked intestine, on July 17, 2009;[2] and the hernia was repaired at that time. He attaches more medical records, including some from the 5+ months he was at the FMC and others from after his release, including his emergency hernia surgery 2+ months later. Larson seeks to increase his damage demand because the Louisville doctor told him that he would probably lose his right testicle and the loss of a body part should be compensable. He also complains that he had to pay for the surgery, and he supplies documents showing that he paid a $15 co-pay through an indigency program and the efforts of others at Dismas House.

With regard to his release gratuity, Plaintiff states that he was given a $50 gratuity, rather than $25, and he recites how it was spent. After writing to the BOP to obtain the proper administrative remedy form, he recently submitted it to the final level of the BOP, the National Office. Therefore, he contends that he has now exhausted the administrative process on that issue. Larson supplies the response of the BOP about the topic at the next-to-last-level of the administrative process, wherein the Regional Director has written as follows:

> Program Statement 5873.06, Release Gratuities, Transportation, and Clothing, provides that an inmate's spending habits, trust fund balance, community resources, and available resources of the institution are among the factors to be considered in deciding on a release gratuity. The gratuity funds available to FMC Lexington are limited. The Warden's response indicates you received approximately $328 in the past six months, but did not save for release. You have received a 120 day Public Law Residential Reentry Center placement. A gratuity of $500 is not warranted in your case.

---

[2] While the Plaintiff gives the date of his surgical repair as July 17th, the Defendants' reference to the date of the surgery is June 17, 2009. The latter is assumed to be the correct date, based on the fact that the parties refer to the surgery as already having been performed in the last of their pleadings, which were filed on or before June 30, 2009, and also based on the date given in a declaration attached to D.E. 25.

Record No. 23, Exhibit B, dated April 3, 2009 [four days before Larson's release].

Plaintiff's construed Motion for Discovery seeks to locate Physician's Assistant Phillip Lefleur, who purportedly told Larson that Dr. Growse and the URC would not approve a hernia surgery because of the cost; documents from Oklahoma City relating to the 2008 revocation of his parole and his medical examination there; and "any and all pertinet [sic] material in possession of the United States on Plaintiff."

The Defendants have filed a Response to Plaintiff's Motions. They do not oppose the request to add to the medical records because these records purportedly support their position that Larson was receiving constant medical attention, there was simply not enough time for the agreed-to surgery, and Plaintiff's need was not so pressing as he now states, as evidenced by the fact that he did nothing on his own to repair the hernia for the almost 6 years that he was not in prison. Finally, the Defendants repeat their earlier defense, that Plaintiff has not carried his burden of alleging "specific acts or orders of the individual members of the URC that prohibited or delayed the hernia repair surgery." Therefore, his cause should not survive the instant Motion to Dismiss.

## DISCUSSION

### Applicable Standards

In reviewing a Rule 12(b)(6) Motion, the Supreme Court of the United States has directed that well pled allegations must be taken as true and must be construed most favorably toward the non-movant. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) only if there is not law to support the claims, if the alleged facts are insufficient to state a claim, or if on the face of the complaint there is an insurmountable bar to

relief. *See Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697 (6th Cir. 1978)); *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976); *see also Gazette v. City of Pontiac*, 41 F.3d 1061 (6th Cir. 1994) (affirming dismissal of a § 1983 complaint).

The standard which the Defendants must meet in their Motion to Dismiss is set out in Federal Rule of Civil Procedure 12(b), which provides that prior to responding to a Complaint, a Defendant may bring a Motion to Dismiss on certain grounds which are listed in the Rule.  Subsection 12(d) specifically provides, in pertinent part, as follows:

> If, on a motion under Rule 12 (b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given reasonable opportunity to present all the material that is made pertinent to the motion.

*Id.*  Thus, the plain language of the rule requires that if the Rule 12(b)(6) or 12(c) motion has attachments which the Court considers, then the motion "must" be converted into a motion for summary judgment pursuant to Rule 56.  *See Song v. City of Elyria, Ohio*, 985 F.2d 840, 842 (6th Cir. 1993).

In the case *sub judice*, because the Court has, indeed, considered the parties' attachments, including declarations supplied by the Defendants and medical records filed by both parties, the Court must now consider the Defendants' submission as a Motion for Summary Judgment.  *See Soper v. Hoben*, 195 F.3d 845, 850 (6th Cir. 1999).  Therefore, the Court also examines the standards for summary judgment.

Summary judgment should be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (2007).  The

evidence, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the nonmovant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 245 (6th Cir.), *cert. denied,* 522 U.S. 967 (1997).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986). The significant question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53 (1986).

The moving party has the burden of showing there is an absence of evidence to support a claim. *Celotex*, 477 U.S. at 324-25; *see EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1093 (6th Cir. 1998). After the moving party carries its burden, the non-moving party must go beyond the pleadings to present significant probative evidence in support of the complaint by designating affidavits, depositions, answers to interrogatories, and admissions on file, which show that there is a genuine issue of material fact for trial. *Id*; *see Hall v. Tollett*, 128 F.3d 418, 422 (6th Cir. 1997). If the non-moving party completely fails to prove an essential element of his or her case, then all other facts are rendered immaterial. *Celotex,* 477 U.S. at 322-23.

The Court begins is consideration herein with a pre-condition to any prisoner's civil rights lawsuit: exhaustion of his available administrative remedies, as is required by 42 U.S.C. § 1997e. The Defendants admit that Plaintiff has administratively exhausted his Eighth Amendment claim,

9

*i.e.*, that BOP personnel were deliberately indifferent to Larson's serious medical needs. Therefore, the Court will look further into this claim below. As to the Plaintiff's challenge to the amount of his release gratuity, the BOP Defendants contend that this claim was never exhausted, and so it should be dismissed consistent with 42 U.S.C. 1997e(a). The Plaintiff, however, counters that he completed the last step of the available remedies after he was released from BOP custody, and it is now exhausted.

### Release Gratuity

Determining whether the release gratuity claim was exhausted or not does not affect the disposition of this claim today. If it was not exhausted, then the claim must be dismissed consistent with 42 U.S.C. 1997e for lack of exhaustion of the administrative remedies prior to filing suit. If the claim was properly exhausted, Plaintiff is still not entitled to the relief he seeks herein, because he has shown no violation of the Constitution or other federal law.

The Defendants point to **18 U.S.C. § 3624. Release of a prisoner**, as authority for the "release gratuity," a/k/a "gate money," which a departing prisoner may be given:

> . . .
>
> **(d) Allotment of clothing, funds, and transportation.**--Upon the release of a prisoner on the expiration of the prisoner's term of imprisonment, the Bureau of Prisons shall furnish the prisoner with--
>
>> **(1)** suitable clothing;
>>
>> **(2)** an amount of money, not more than $500, determined by the Director to be consistent with the needs of the offender and the public interest, unless the Director determines that the financial position of the offender is such that no sum should be furnished; and
>>
>> **(3)** transportation . . .

18 U.S.C.A. § 3624(d). The BOP, in turn, has promulgated **28 C.F.R. § 571.20 Purpose and scope**, which implements the statute, by providing as follows:

> It is the policy of the Bureau of Prisons that an inmate being released to the community will have suitable clothing, transportation to the inmate's release destination, and some funds to use until he or she begins to receive income. Based on the inmate's need and financial resources, a discretionary gratuity up to the amount permitted by statute may be granted.

28 C.F.R. § 571.  And the BOP manual for application of these provisions is the Program Statement cited by the Defendants, P.S. 5873.06.

The law governing these gratuities is clear and uncomplicated.  The terms of the statute provide that the maximum sum which a prisoner may be given is $500, and also provide that a prisoner may be denied any sum at all.  18 U.S.C.A. § 3624(d)(2).  Most importantly, the statute leaves the amount of the gratuity to be "determined by the Director to be consistent with the needs of the offender and the public interest."  *Id.*  Similarly, the BOP regulation implementing the statute refers to the "funds" as "a discretionary gratuity."  28 U.S. C. § 571.20.

Therefore, there is no question that the decision for each out-going prisoner is discretionary, must be made by the BOP, must be independently set for each prisoner, and can be in any amount up to the $500 maximum.  The courts addressing the issue agree.  *Kenan v. Francis*, 2006 WL 3900109 (N.D.W.Va. 2006) (not selected) (citing *Palmer v. Bureau of Prisons*, 2006 WL 533511 (D.Or. 2006) for the proposition that "gate money to departing inmates . . . is merely a discretionary gratuity"); *see also Morrow v. Rios*, 2009 WL 924525 at *14 (D.Minn. 2009) (slip op.) ("[W]hether to grant a prisoner a release gratuity, is purely discretionary").

In the recent *Morrow* case, cited by the Defendants, the departing inmate also sought $500, but received $100.  The United States District Court for the District of Minnesota found that a prisoner had  no entitlement to $500 in the statute or regulation.  It also focused on the prisoner's

claim that the BOP's failure to give him the $500 was a due process violation.  The Court looked at the nature of the Plaintiff's interest and the courts' historical treatment of types of interests which are granted some protection by the Constitution's Due Process Clause.

The Minnesota District Court wrote that "the Petitioner's interest in a release gratuity does not rise to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Morrow*, 2009 WL 924525 at *14 (quoting from *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)).  It also decided that the prisoner had not presented a legally cognizable liberty interest in the gratuity so as to trigger the due process protections *Id.* fn.14 (quoting from *Sandin v. Conner*, 515 U.S. 472, 486 (1995)).  In sum, "Petitioner's suggestion, that he had an entitlement to the release gratuity, is untenable.  Consequently, having failed to establish a necessary element of his claim – namely, the existence and deprivation of a property interest – the Petitioner's claim must fail." *Id*. at 15.

To the extent that the instant prisoner's allegations can be construed to urge a due process violation as Morrow did, this Court agrees with the rationale and result of *Morrow*.  Accordingly, this Court will dismiss the release gratuity claim in this case for Plaintiff's failure to state a claim upon which the Court may grant relief.  *See also Mose v. Baney*, 2005 WL 4898861 at *2 (D.Md.) (The decision to provide a release gratuity of only $50 and a bus ticket "does not violate statutory or constitutional dictates") *affm'd*, 180 Fed.Appx. 469 (4th Cir. 2005).

### Hernia Repair

The Court moves on to the Plaintiff's alleged Eighth Amendment claim, *i.e.*, that the BOP's failure to provide Larson with a surgical repair of his hernia amounted to cruel and unusual

punishment.  As to such a claim, the Supreme Court has held that "[i]n order to state a cognizable claim [under the Eighth Amendment with regard to medical care] a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to the plaintiff's serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Therefore, a prisoner must show both "deliberate indifference" and "serious medical needs."  *Id.*

A claim for deliberate indifference, therefore, has both a subjective and an objective component.  *Wilson v. Seiter*, 501 U.S. 294 (1991); *Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir.2001); *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992).  To satisfy the objective component the plaintiff must allege a "sufficiently serious" medical need. *Comstock*, 273 F.3d at 703 (citation omitted).  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County,* 390 F.3d 890, 897 (6th Cir.2004) (citation omitted); *see also Loggins v. Franklin County*, 2007 WL 627861, *4 (6th Cir. 2007).

The concept of deliberate indifference has been equated with wantonness and with acts that are taken with criminal recklessness.  *Brooks v. Celeste*, 39 F.3d 125 (6th Cir. 1994) (citing *Farmer v. Brennan*, 114 S. Ct. 1970 (1994)).  Liability attaches only when the plaintiff "demonstrate[s] deliberateness tantamount to intent to punish." *Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir.1994) (citation omitted); *see also Wilson*, 501 U.S. at 299 (quoting from *Whitley v. Albers,* 475 U.S. 312, 319 (1986) ("To be cruel and unusual punishment, conduct that does not purport to be punishment must involve more than ordinary lack of due care for the prisoner's interests or safety.... It is obduracy and wantonness, not inadvertence or error in good faith, that characterize

13

the conduct prohibited by the Cruel and Unusual Punishments Clause")).

Of these requisites for stating a Constitutional claim, the Defendants herein concede that Plaintiff has presented a serious medical condition with regard to his hernia. However, they claim, Larson has failed to present any evidence of the culpable state of mind necessary to constitute the second element of this Constitutional claim, the subjective component. No Defendant is alleged to have performed any specific act displaying deliberate indifference to Larson's hernia. Nowhere does the Plaintiff identify any action taken by any person who acted under color of federal law and who supposedly showed the requisite culpable mind.

Plaintiff originally named only the United States of America as the defendant. From his allegations about the URC's being responsible for denying the hernia surgery, the Court liberally construed that the complained-of members of the URC were John Doe Defendants, and the Court advised Larson of the terms of Federal Rule of Civil Procedure 4(m). The Court put Larson "on notice that if any John Doe defendants are not *named and served* within 120 days, then the claims against said John Doe defendants shall be dismissed." Record No. 7 (emphasis added). However, none were named and served.

No doubt, part of the reason for the Plaintiff's failure to show deliberate indifference is that he failed to name an individual as a Defendant. Plaintiff's claims for injunctive relief have been mooted by his subsequent surgery. With regard to damages, the named Defendant, the United States, and the construed Defendant, the URC, are protected from liability by sovereign immunity. "In a suit against the United States, there cannot be a right to money damages without a waiver of sovereign immunity." *United States v. Testan*, 424 U.S. 392 (1976); *see also Will v. Michigan Dept.*

14

*of State Police*, 109 S.Ct. 2304 (1989); *Kentucky v. Graham*, 473 U.S. 159 (1985).

Similarly, United States agencies are immune from suit under the civil rights statutes.  *See Savage v. United States*,  450 F.2d 449, 451 (8th Cir. 1971) (42 U.S.C. §1983),  *cert. denied*, 405 U.S. 1043 (1972);  *Smallwood v. United States*,  358 F.Supp. 398 (E.D. Mo.) (42 U.S.C. §1985), *aff'd*, 486 F.2d 1407 (8th Cir. 1971).   Therefore, the Court also does not have subject matter jurisdiction over the Plaintiff's constitutional tort or civil rights claims against the Utilization Review Committee, a sub-set of an agency of the United States, *i.e.*, the Federal Bureau of Prisons.

*Davis v. Passman*, 442 U.S. 228 (1979), does allow federal jurisdiction under 28 U.S.C. § 1331 against individual federal officers for damages against the federal defendants in their individual capacities for violations of constitutional rights under the doctrine of *Bivens*.   However,  even then, the alleged conduct of the federal officer must rise to the level of a constitutional violation.   The Plaintiff herein, to date, has not named and served anyone in his individual capacity, nor has he alleged what any individual federal officer did or failed to do that amounts to a violation of the United States Constitution.

At the end of his pleading titled "Response and Discovery" [Record No. 24/26], Plaintiff did certify service of a copy of this pleading on "all defendants," and followed that statement with the names of certain FMC-Lexington personnel.   He specifically listed Warden Dewalt, Assistant Warden Ferris, Social Worker Laurer, and Doctors Growse, Morales and Cordero.   However, he has not sought to have them served.   Nor has Plaintiff identified who among them was deliberately indifferent to his hernia problem.   Most importantly, he has still not alleged what any one of them did, from which to draw the inference that he/she was deliberately indifferent to his suffering with

the hernia.

Even had he properly pursued these late-named persons individually, they would be entitled to dismissal for Plaintiff's failure to state a Constitutional claim against them. Taken as a whole in a case which now fills two volumes, Larson's allegations against these named staff members appear in only one pleading, titled "Response and Discovery." [Record No. 24/26] In it, he merely lists certain individuals in the certificate and then makes general allegations about them elsewhere in the pleading.

The majority of Plaintiff's allegations in this one pleading concern Dr. Growse. Larson has alleged (1) that his PA, named LeFleur, quit his job after several purported confrontations with the URC and Dr. Growse, after he purportedly recommended Larson's surgery and put Larson on the list of persons who did not have work and would get a bottom bunk for medical reasons. Also, he suggests Growse's culpability based on (2) Larson's raising the issue in the administrative remedy system on December 2, 2008, and Dr. Growse's not see him until fourteen days later, on December 16th; and then (3) "sixty days passed before being seen by a General Surgeon for hernia." Record Nos. 24/26. Even if these allegations are accepted as true, the Court finds nothing in these purported actions which can be said to reflect a malicious intent on the part of Dr. Growse.

In the declaration of Dr. Growse and in the Plaintiff's medical records, the Defendants have offered uncontroverted evidence that the Plaintiff was healthy enough for his placement in the general population of the prison. He reported no pain during the month prior to his arrival at the FMC-Lexington. Larson was also seen within two months, which is the average a prisoner must normally wait. When Growse examined him on December 16, the doctor immediately agreed that

16

a surgical evaluation was necessary, and he told Plaintiff that "the request would be given the priority of a medically necessary, timing elective procedure, instead of the medically acceptable priority given to most requests for hernia repair."

A general surgeon then examined Larson, recommended the open repair, and warned Plaintiff to anticipate a slow recovery from the swelling.  On March 24, 2009, Plaintiff's primary physician reviewed the report and requested that the surgery be scheduled.  According to Growse, all of these medical experts had agreed to take steps to try and accomplish the surgical repair.  The scheduling normally takes two weeks, and by this time, that Plaintiff's release was imminent.  "In my professional opinion, it would have been difficult to schedule this surgery and allow for any post-operative care prior to Mr. Larson's parole release on April 7, 2009."

As to the rest of people whom Plaintiff listed as defendants on Docket Entry Nos. 24/26, Larson has made even fewer and weaker allegations.  He has written:

> . . .  I assume that through Department Meetings that all Medical Staff were made aware of Plaintiff's grievances and Hernia.  Since three (3) of the Utilization Review Committee's members are Hospital Staff all were aware of the Plaintiff's condition and needs.  Further the grievance would of been discussed by the Warden and Assistant Warden two (2) more members of the URC.

*Id.* at 2.  The Court notes that Plaintiff's allegations are not of actual conduct by any identifiable person but are his own conclusory statements: "I assume . . . Medical Staff were made aware . . . all were made aware . .  would of been discussed . . . ."  These are all insufficient allegations to support liability which requires a culpable state of mind.

The Defendants have shown that the care which Plaintiff received during his FMC-Lexington incarceration was substantial.  He complains that he did not receive the surgery he wanted in the 5-6

17

months which he spent imprisoned there, but he also did not obtain it in the 5-6 years prior to that time when he was not imprisoned.  His request for the surgery upon re-incarceration may have been for the same reason for which he also asked for a dental evaluation then: because he had not taken care of himself for the last 5-6 years.[3]

Regardless, however, the time has now passed for Plaintiff to carry his burden of putting forth evidence of a Constitutional violation.  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1964-65 (2007) (citations omitted*).*

Although this Court has long recognized that *pro se* pleadings are to be held to a less stringent standard than formal pleadings drafted by lawyers, *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972), "[o]ur duty to be 'less stringent' with pro se complaints does not require us to conjure up unpled allegations." *McDonald v. Hall,* 610 F.2d 16, 19 (1st Cir.1979) (citation omitted); *Holsey v. Collins*, 90 F.R.D. 122 (D. Md. 1981) (even *pro se* litigants must meet some minimum standards).

Despite liberal construction of *pro se* claims, the courts have still been unwilling to abrogate basic pleading essentials in such suits.  *See*, *e.g.*, *Merritt v. Faulkner*, 697 F.2d 761 (7th Cir.) (duty to be less stringent with *pro se* complaint does not require court to conjure up unpled allegations), *cert. denied*, 464 U.S. 986 (1983); *McDonald v. Hall*, 610 F.2d 16 (1st Cir. 1979) (same).  Any Defendant is entitled to proper notice.  *Jarrell v. Tisch*, 656 F. Supp. 237 (D. D.C. 1987) (*pro se* plaintiffs should plead with requisite specificity so as to give defendants notice).

---

[3] He did not state but the record suggests that he wanted all this medical and dental attention while at FMC-Lexington, so that he would not have to pay for it.

In short, the Plaintiff herein has failed to allege the factual basis of his claims. Of the following, *i.e.*, the original Defendants (the United States and URC), the construed John Doe Defendants, and the persons on Plaintiff's late list of defendants, none should be required to "conjure up unpled allegations." *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989). "A plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim. When a complaint omits the facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 437 (6th Cir. 1988) (quoting *O'Brien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976), *cert. denied*, 431 U.S. 914 (1977)).

Moreover, once the Defendants noted the Complaint's deficiencies in their dispositive motion, Plaintiff still failed to come forward with facts to controvert the Defendant's assertions. To the contrary, to date, he has failed to describe what each purported Defendant knew; what he or she did or failed to do; and how each was involved in unconstitutional behavior. In *Brady v. Halawa Correctional Facility*, 285 Fed.Appx. 424 (9th Cir. 2008) (not reported), the appellate court upheld a summary judgment against a prisoner complaining of an intentional delay of his hernia surgery, "because Brady did not present any evidence that defendants intended to interfere with his medical treatment. See Fed.R.Civ.P. 56(e) (requiring submission of evidence in opposition to motion for summary judgment)." *Id*. at ** 1. Such is exactly the case herein.

Similarly, in this circuit, the appellate court has affirmed a grant of summary judgment to a Kentucky prisoner who suffered from an inguinal hernia and a detached left biceps. The Sixth Circuit found that in the civil rights action which he had filed in this Court, Plaintiff Wright had "failed to allege facts that, if proven, would rise to the level of the serious deprivation and deliberate

indifference required to support an Eighth Amendment claim." *Wright v. Sapp*, 59 Fed.Appx. 799, 801 (6th Cir. 2003) (not selected for publication), *cert. denied*, 540 U.S. 970 (2003).   Therefore, summary judgment on behalf of the Defendants was appropriate.

Additionally, in this case, in the Order advising Plaintiff to respond to the Defendants' alternative Motions, the Court itself put Plaintiff "on Notice that failure to respond to a motion shall be grounds for the Court to conclude that any arguments in opposition thereto have been waived. *See Humphrey v. U.S. Attorney Gen. Office*, 279 Fed.Appx. 328, 2008 WL 2080512 (6th Cir. May 15, 2008) (slip op.)"  Record No. 22.  Yet Plaintiff's only responses were, like his Complaint, full of broad accusations but no demonstrable facts.

The Court finds that to the extent that there are any identifiable individual Defendants herein, there is an absence of evidence to support deliberate indifference, one of the two crucial elements to the Eighth Amendment claims asserted against them herein (*Celotex Corp. v. Catrett*, 477 U.S. at 324-25); and that Plaintiff has failed to carry his burden to come forward with "affirmative evidence to defeat a properly supported motion for summary judgment" (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 257).  The Plaintiff's broad allegations and general arguments do not defeat the Defendant's well supported Motion for Summary Judgment.  *Matsushita*, 475 U.S. at 587.

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.*  That is exactly the circumstance in this case.  Further, this Court has concluded that the Defendants are entitled to judgment as a matter of law.  *Anderson v Liberty Lobby, Inc.*, 477 U.S. at 247.  *See also Taylor v. Little*, 58 Fed.Appx. 66, 67, 2003 WL 68129,  **1 (6th Cir. 2003) (not reported).  For these reasons, the Defendant's Motion

for Summary Judgment will be granted and this action dismissed.

## CONCLUSION

Accordingly, the Court being advised, **IT IS HEREBY ORDERED** as follows:

(1)     The Defendants' Motion to Seal Exhibit B to D.E. 20-21 [Record No. 20] is **GRANTED**.

(2)     Plaintiff's Motion for an Order permitting him to add exhibits in support of his claims [Record No. 23] is **GRANTED**.

(3)     The Defendant's Motion for Summary Judgment [Record No. 21] is  **GRANTED**.

(4)     Plaintiff's Motion for Discovery [Record No. 26] is **DENIED**, as the matters to be inquired into are not relevant to the medical attention which Plaintiff received at FMC-Lexington in the period of time at issue herein.

(5)     This action will be **DISMISSED**, for Plaintiff's failure to state a claim upon which this Court may grant relief and Judgment shall be entered contemporaneously with this Memorandum Opinion and Order in favor of the Defendants.

Dated this 30th day of July, 2009.

Signed By:

_Karen K. Caldwell_

**United States District Judge**

21